# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TANGLER MEYERS,<br>on behalf of herself and others similarly situated,<br><div align="center">Plaintiff,</div><div align="center">v.</div><br><br>FREEDOM CREDIT UNION,<br><div align="center">Defendant,</div><div align="center">v.</div><br><br>CREDITOR RESOURCES, INC.,<br><div align="center">Third-Party Defendant.</div> | CIVIL ACTION<br><br>No. 05-3526 |

Pollak, J.                                                        September 21, 2007

<div align="center">OPINION</div>

Presently before the court are defendant Freedom Credit Union ("FCU") and third-party defendant Creditor Resources, Inc.'s ("CRI") motions to dismiss plaintiff Tangler Meyers's amended complaint for failure to state a claim on which relief can be granted. In addition, CRI has filed a motion to dismiss FCU's third-party complaint against it, and Meyers has filed a motion for class certification.

## I.      Facts Alleged

Tangler Meyers alleges that she applied for a loan from defendant FCU on June 8, 2004. FCU denied her application by letter dated June 9, 2004, and it notified her that its decision was based at least in part on a credit report obtained from a company called Credit Bureau Associates located at 1111 Woodcrest Road, Cherry Hill, NJ 08038, with a

<div align="center">-1-</div>

telephone number of 1-888-397-3742.  Meyers alleges that this information was incorrect, as there was no business of that name at that address and telephone number.  She further alleges that FCU received her credit data, if at all, from a company called Experian.  This error, according to Meyers, was repeated in multiple loan denials that she received from FCU after June 8, 2004.

Meyers is suing for a violation of 15 U.S.C. § 1681m(a)(2)(A), a provision of the Fair Credit Reporting Act ("FCRA"), Pub. L. No. 91-508, 84 Stat. 1136 (1970).  Section 1681m(a)(2)(A) requires that when a prospective creditor declines to extend credit to a consumer on the basis of information received from a credit reporting agency, it must provide the consumer with the name, address, and toll-free telephone number of the agency.  Meyers seeks class-action certification, as she alleges that she received a form letter, and that many other consumers who sought and were denied credit from FCU were similarly misinformed as to the true source of their credit data.

FCU has filed a third-party complaint against CRI, a company it alleges provided and managed the computer program that produced the adverse action letters at issue. FCU alleges that CRI is liable in indemnity or contribution for any FCRA violation caused by CRI's software.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), defendants who so move are entitled to the dismissal of complaints that "fail[] to state a claim on which relief can be granted."  A court may only grant this relief if the allegations of the complaint do not

"raise [the plaintiff's] right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1959 (2007).  Keeping in mind that the rules of civil procedure require that a complaint contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), it need do no more than "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

## III.  Motion to Dismiss Meyers's Amended Complaint

The defendants' motions to dismiss Meyers's amended complaint present two issues: (1) whether the 2003 Fair and Accurate Credit Transactions Act ("FACTA"), Pub. L. No. 108-159, 117 Stat. 1952 (2003), which amended various sections of FCRA, eliminated a private right of action for the conduct about which the plaintiff complains, and (2) if so, whether that change affects the plaintiff's right to proceed given that the alleged violation occurred before FACTA took effect.

### A.     Whether FACTA eliminated private rights of action

Before Congress passed FACTA in 2003, it was beyond dispute that individual consumers could sue prospective creditors for not providing the notice required by 15 U.S.C. § 1681m(a)(2)(A).  This is because 15 U.S.C. §§ 1681n & 1681o provided private rights of action for all willful (§ 1681n) and negligent (§ 1681o) violations of 15 U.S.C. §§ 1681–1681x.

In FACTA, however, Congress added some language to § 1681m that the defendants argue (and many courts agree) eliminated private rights of action as to that section. Specifically, it added § 1681m(h). That subsection requires prospective creditors to notify consumers when they offer credit on less favorable terms because of the consumer's credit history—a practice known as "risk-based pricing." Under prior law, only when prospective creditors denied credit altogether did they have to give such notice. At the end of the new risk-based pricing rules, § 1681(h)(8) provides:

> (A) No civil actions
> Sections 1681n and 1681o of this title shall not apply to any failure by any person to comply with this section.
> (B) Administrative enforcement
> This section shall be enforced exclusively under section 1681s of this title by the Federal agencies and officials identified in that section.

As stated, §§ 1681n and 1681o are the sections that provide private rights of action. Section 1681s provides for enforcement by the Federal Trade Commission. The question presented is whether Congress intended these subparagraphs (eliminating private rights of action and providing exclusively for administrative enforcement) to apply only to the new risk-based rules in subsection (h) or to all of § 1681m.

The defendants point out that in the world of federal legislative drafting, "section" is—or at least is aspired to be—a term of art. *See Koons Buick Pointiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (noting that "Congress ordinarily adheres to a hierarchical scheme in subdividing statutory sections"). According to the House Legislative Counsel's drafting manual, the basic units of titles of the United States Code are

-4-

"sections."  U.S. House of Representatives Office of Legislative Counsel, House Legislative Counsel's Manual on Drafting Style, HLC 104–1, at 23–24 (1995) [hereinafter House Manual].  "Sections" are divided into "subsections," which are preceded by lower-case letters in parentheses; "paragraphs," which are preceded by Arabic numerals in parentheses; "subparagraphs," which are preceded by upper-case letters in parentheses; and "clauses," which are preceded by lower-case Roman numerals in parentheses.  *Id.*  When Congress wishes to interpose new sections in the United States Code between consecutive ones, it often designates the new sections with consecutive lower-case letters following the original section number and not set off in parentheses. Thus, 15 U.S.C. § 1681a is the section that follows 15 U.S.C. § 1681, not a subsection of 15 U.S.C. § 1681.  The first subsection of 15 U.S.C. § 1681 is 15 U.S.C. § 1681(a).  The House drafting manual recommends using the appropriate term of art in internal cross references.  *Id.* at 51–52.  Under the assumption that Congress did so here, 15 U.S.C. § 1681m(h)(8)(A) must be read to retract private rights of action for violations of the entire *section*, that is all of 15 U.S.C. § 1681m.  Had it meant to retract private rights of action *only* for violations of the new risk-based pricing rules in 15 U.S.C. § 1681m(h), it would have used term of art "subsection."

The defendants further note that Congress consistently used the hierarchical terms of art appropriately throughout FCRA and FACTA.  Indeed, even a cursory look at § 1681m reveals that Congress used the designations "section," "subsection," "paragraph," "subparagraph," and "clause" throughout in accordance with their accepted

meanings.  *See, e.g.*, 15 U.S.C. § 1681m(a)(2)(A)(I) (referring to "clause (ii)"); 1681m(c) (referring to "section" in a provision that can only logically apply to entirety of § 1681m); 1681m(h)(3) (referring to "subsection (a)"); 1681m(h)(6)(B) (referring to "subparagraph (A)"); 1681m(h)(6)(B)(v) (referring to "paragraph (1)").[1]

But Meyers argues there is more to the story.  Specifically she claims that the structure, history, and purpose of FACTA all weigh against the defendants' reading.  As to structure, she argues that if Congress had meant to extinguish private rights of action for all of § 1681m, it would have given the relevant provision its own subsection, not tucked it into the end of the subsection delineating new risk-based pricing rules.  The defendants, on the other hand, note that in putting the extinguishing provision in subsection (h)(8), Congress put it at the very end of § 1681m, which, they contend, makes sense.  I agree with Meyers that placing the provision within the new risk-based pricing rules is perhaps strange, but nothing prevents Congress from doing so, and I find it difficult to read much into the placement of the provision in this instance.

FACTA's history, however, gives more pause.  At the beginning of the first session of the 108th Congress, the House and Senate proposed competing versions of what would become FACTA—both proposing wide-ranging amendments to FCRA.  The House version did not address risk-based pricing.  *See generally* H.R. 2622, 108th Cong.

---

[1] It is worth noting that when Congress references more than one unit of the Code, it uses the designation of the senior unit.  *See, e.g.*, 15 U.S.C. § 1681m(b)(2)(B) (referring to "section 1681a(k)(1)(A)," not subparagraph 1681a(k)(1)(A); (e)(2)(A) (referring to "paragraph (1)(A)," not subparagraph (1)(A)); *see also* House Manual, at 52 ("If the reference is to more than 1 unit, the reference is to the senior unit.  Thus, refer to section 5(a)(1) and not paragraph 5(a)(1).").

(as passed by the House, Sept. 10, 2003).  The Senate version did: section 311 of the Senate bill created a new subsection of § 1681m to require notice when a consumer's credit data garnered a less advantageous price.  *See* H.R. 2622 § 311, 108th Cong. (as passed by the Senate, Nov. 5, 2003).[2]  Neither chamber receded to the other's version, and so a conference committee was convened.  *See* 149 Cong. Rec. S13994 (daily ed. Nov. 5, 1003) (Senate requests conference); H10514 (daily ed. Nov. 6, 2003) (House agrees to conference).

At conference, the committee retained § 311 of the Senate bill (and thus decided to require notice in risk-based pricing situations), but it tacked on two new provisions: 15 U.S.C. § 1681m(h)(7) & (8).  H.R. 2622, 108th Cong. § 311 (as proposed by conference committee, Nov. 23, 2003).  Unlike the other subsections of § 311 of the Senate bill, which properly reference the various subdivisions of the Code, the conference-proposed paragraphs are puzzling.  First, paragraph (7), which purports to excuse violations of "this section" where the violator maintained reasonable policies and procedures, is superfluous.  Another provision of 15 U.S.C. § 1681m, subsection (c), already made the reasonable-procedure defense applicable to all of § 1681m.  This defense, therefore, would have been applicable to new subsection (h) no matter what.  Second, paragraph (8), the provision at issue here, is puzzling because it, somewhat out of the blue, purports to eliminate

---

[2] The Senate amended H.R. 2622 to replace all of the text with the language of the Senate's version, S. 1753, 108th Cong. (2003), before passing it.  149 Cong. Rec. S13980 (daily ed. Nov. 5, 2003).

decades-old private rights of action in a subsection concerned only with risk-based pricing.

One could certainly tell a compelling story that the conference committee, in trying to find a compromise between the Senate's inclusion of risk-based pricing rules and the House's exclusion of them, settled on including them with two provisos: (1) the (h)(7) recognition of the reasonable-procedure defense, and (2) the (h)(8) provisions declining to extend private rights of action to enforce the new rules.  Moreover, bearing in mind the rush in which conference amendments are generated, one could believe that these new paragraphs were not as artfully drafted as the rest of subsection (h), and thus confusingly used the term "section" to refer only to new subsection (h) (also known as "section" 311 of the proposed bill).  But one could also tell a story that the conference committee settled on a different compromise—one that would adopt the risk-pricing rules in return for eliminating private rights of action for all violations of § 1681m.  In this story, the language used in subsection (h)(8) was purposeful and consistent with Congress's usual drafting procedures.

The legislative history provides few clues as to which story is closer to the truth. The conference committee did not comment on § 311 of the reported bill, *see generally* H.R. Rep. 108-396 (2003), nor did anyone comment substantively on it on the floor of either chamber.  Thus, the contours of the compromise are undiscoverable in the pages of the Congressional Record.

Meyers notes that it would be odd for Congress to wipe away private rights of action that had existed for decades without so much as a peep, and, indeed, the Supreme Court on occasion has invoked this "dog that did not bark" canon of interpretation. *See, e.g.*, *Koons*, 543 U.S. at 63; *Chisolm v. Roemer*, 501 U.S. 380, 396 n.23 (1991). But it is well-within Congress's power to enact a sweeping change without comment, so courts must be careful not to read more into Congressional silence than is warranted. *See, e.g.*, *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980) (cautioning against reading into Congressional silence). Indeed, it is not hard to imagine that members of Congress—as politicians—might on occasion have an interest in not explaining themselves at great lengths. Here, reading deeply into Congress's silence on the risk-based pricing issue would be unwise, as the conference committee declined to elaborate on *any* of the compromises it struck. *See generally* H.R. Rep 108-396. Thus, silence on the added provisions to FACTA § 311 is consistent with the committee's broader choice not to elaborate on any of its work, which is, of course, its prerogative.

Finally, Meyers argues that the purpose of FACTA was to expand consumers' rights, not to retract them. It is true that the committee reports claim that the central purpose of FACTA was to enhance consumer protection. *See, e.g.*, H.R. Rep. 108-263 (2003), at 1 (describing the Act's purposes as "to prevent identity theft, improve resolution of consumer disputes, improve the accuracy of consumer records, [and] make improvements in the use of, and consumer access to, credit information"). I do not find these general statements of purpose helpful here because, in light of the history just

discussed, it is clear that the House and Senate struck a compromise with regard to the risk-based pricing rules in which the pro-consumer side gave some ground. What I must discern are the precise contours of that compromise, and statements of general purpose do not illumine that question.

In the end, I cannot make my way around the language of the statute to arrive at Meyers's position. Because Congress was so consistent in using the hierarchical words of art in the rest of § 1681m—and indeed the rest of FCRA—I conclude that it did likewise in paragraph (h)(8). While it is possible that Meyers's interpretation is what the Congress and the conference committee intended, it is not what they wrote. Given the primacy of text and structure in statutory interpretation, Meyers's theory about its drafting history is not supported by enough evidence to overcome the most natural reading of the text. *See Lamie v. United States Tr.*, 540 U.S 526, 534 (2004) (relying on statutory text because, though it was "awkward, and even ungrammatical," its meaning was plain).

I note that almost all of the courts that have examined this aspect of the 2003 amendments of FCRA have come to similar conclusions. *See, e.g.*, *Perry v. First Nat'l Bank*, 459 F.3d 816, 823 (7th Cir. 2006); *Soroka v. JP Morgan Chase & Co.*, ___ F. Supp. 2d ___, 2007 WL 895249, at *6 (S.D.N.Y. Mar. 19, 2007); *White v. E-Loan, Inc.*, 409 F. Supp. 2d 1183, 1187 (N.D. Cal. 2006). *But see Barnette v. Brook Road, Inc.*, 429 F. Supp. 2d 741, 749 (E.D. Va. 2006).

**B.     Whether the elimination of a private right of action is retroactive**

Meyers alleges that she received the offending letter in June 2004.  FACTA took effect on December 1, 2004, and Meyers brought suit in July 2005.  Meyers argues that because her cause of action accrued before FACTA took effect, FACTA should not bar it.  Her contention is that FACTA does not apply retroactively under the Supreme Court's analysis in *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) and *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997).  *Landgraf* provide a two-step test for determining whether a statute should apply retroactively.  *Landgraf*, 511 at 280.  First, a court must determine whether Congress expressly provided for the temporal reach of the statute.  *Id.*  If so, the court should —within the bounds of the Constitution— apply the statute accordingly.  *Id.*  If not, the court should determine whether applying the statute retroactively would have unfair effects, such as imposing liability or new obligations on completed conduct, or impairing rights a party thought it possessed when it acted.  *Id.*  If so, then the statute should not apply retroactively, and if not, it should.  *Id.*

As an initial matter, the defendants argue that the *Landgraf* analysis is inappropriate here because FACTA was signed into law on December 4, 2003, some months before June 2004 when the conduct at issue took place.  They acknowledge that the statute did not come int force until after the conduct was completed, but they advance the position that the general rule against applying statutes retroactively is based on fairness and notice concerns and that these do not come into play in the temporal gap between the enactment of a statute and its effective date.[3]  I find defendants' position

---

[3] Congress delegated to the Board of Governors of the Federal Reserve System and the Federal Trade Commission the task of setting the statute's effective date.  *See* FACTA § 3.

unpersuasive.  While it is the case that, at the time of the alleged conduct, the plaintiff

was, in a formal sense, on notice that a new statute had been passed, it is also the case that

she was, in a formal sense, on notice that the new statute had yet to take effect.  One

would not ordinarily expect to be governed by a law that, though on the books, Congress

had not yet brought into force.  Therefore, applying the FACTA amendments  to conduct

that occurred before the amending statute's effective date raises the concerns of fair

notice and settled expectations that the Supreme Court addressed in *Landsgraf* and that

undergird the anti-retroactivity principle.  *See* 511 U.S. at 270 (noting that the anti-

retroactivity principle is based on "familiar considerations of fair notice, reasonable

reliance, and settled expectations").[4]

    "When a case implicates a federal statute enacted after the events in suit, the

court's first task is to determine whether Congress has expressly prescribed the statute's

proper reach."  *Id.* at 280; *accord Hughes Aircraft Co.*, 520 U.S. at 946.  Here, the

defendants argue that Congress did so in FACTA § 312(f), which states:

> Nothing in this section, the amendments made by this section, or any other
> provision of this Act shall be construed to affect any liability under section
> 616 or 617 of the Fair Credit Reporting Act [15 U.S.C. §§ 1681n & 1681o]
> that existed on the day before the date of enactment of this Act.

---

Those agencies brought FACTA § 311(a) (15 U.S.C. § 1681m(h)) into force on December 1, 2004.  12 C.F.R. § 222.1(c)(2)(xiii).

[4] Indeed, some courts, as well as Sutherland's treatise, have reasoned that the legislature's setting an effective date later than the date of enactment provides good evidence that it intends the statute to have only a prospective effect.  *See, e.g.*, *People v. Floyd*, 72 P.3d 820, 824 (Cal. 2003); *Wright v. Dir., Fed. Emergency Mgmt. Ass'n*, 913 F.2d 1566, 1572 n.13 (11th Cir. 1990); *Dion v. Sec'y of Health & Human Servs.*, 823 F.2d 669, 672 (1st Cir. 1987); Norman J. Singer, 2 Sutherland Statutes & Statutory Construction § 41:4 (6th ed. 2000).

This is a clear statement that Congress did not intend FACTA to apply to conduct prior to the date of its enactment.  The statement, however, does not address the gap between the statute's enactment and the date on which it took effect.[5]  Defendants argue, by negative implication, that in stipulating that the statute does not apply to pre-enactment conduct, Congress must have intended that the statute apply to post-enactment-but-pre-effective-date conduct.  However, *Landgraf* counsels against applying a statute retroactively without a "clear expression of Congressional intent."  511 U.S. at 264.  The negative implication of FACTA § 312 may be an indicator of Congress's intent, but it is far from a clear expression of it.  I therefore proceed to step two of the *Landgraf* analysis.

Without a clear statement of whether a statute is to apply retroactively, a court "must determine whether the new statute would have a retroactive effect, *i.e.*, whether it would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280.  Defendants argue that the statute would have no such effect because the underlying duty—to provide the prospective borrower with correct information about the source of credit data used to take adverse action against her—is unchanged.  *See Crowder v. PMI Mortgage Ins. Co.*, No. 06-0114, 2006 WL 1528608, at

---

[5] My colleague on this court, Judge O'Neill, has also read FACTA § 312 this way.  *See Miller v. Corestar Fin. Group of Penn.*, No. 05-5133, 2007 WL 419194, at *3 (E.D. Pa. Feb. 5, 2007).

*5 (M.D. Ala. May 26, 2006).  Rather, all that has changed, according to the defendants, is the enforcement mechanism.

Defendants understate the change.  Section 1681n—not available to post-amendment would-be § 1681m plaintiffs—allows pre-amendment plaintiffs to recover compensatory damages, punitive damages, and attorneys fees for willful violations.  *See* 15 U.S.C. § 1681n(a) & (c). Section 1681o—also not available to post-amendment would-be plaintiffs—allows pre-amendment plaintiffs to recover compensatory damages for negligent violations.  15 U.S.C. § 1681o(a).  Section 1681s, which is now the exclusive means of enforcing § 1681m, does not allow for compensatory or punitive damages; rather, it allows the Federal Trade Commission to assess a civil penalty of up to $2,500 per violation, and then only if the violation is part of a "pattern or practice" of violations.  *See* 15 U.S.C. § 1681s(a)(2).  Thus, the substance of the liability equation has changed dramatically.

Perhaps more to the point, from Meyers's perspective, the change is severe. Before FACTA came into force, she had a contingent right to recover from defendants for her alleged injuries.  Post-FACTA, that right is eliminated.  The Supreme Court held in *Hughes Aircraft* that when Congress eliminates a defense to a cause of action, the change impairs a party's rights, and thus should not apply retroactively without a clear expression that Congress intended for it to do so.  520 U.S. at 950.  As a number of courts have held, eliminating an entire cause of action is at least as serious a change in a person's settled expectations as eliminating a defense.  *See Grab v. Am. Lawyers Co.*, No. 05-00812, 2007

WL 842045 (D. Haw. Mar. 19, 2007), at *7; *Panko v. Discover Fin. Servs.*, 458 F. Supp. 2d 580, 585 (N.D. Ill. 2006); *Miller*, 2007 WL 419194, at 4; *see also Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 165–66 (Becker, C.J.) ("In *Hughes*, the Court concluded that retrospective application of the FCA Amendment would have the legal effect of depriving the defendant of a particular defense, and that this constituted a retroactive effect. In the case at bar, retrospective application of the RICO Amendment would have the legal effect of depriving plaintiffs of a claim, which also constitutes a retroactive effect." (citation omitted)).

In sum, applying FACTA retroactively would significantly impair Meyers's pre-existing right to recover for her alleged injuries. Because Congress has not clearly expressed its intent that the statute apply retroactively, I conclude that Congress did not intend the statute to do so. Therefore, FACTA's elimination of a private right of action does not bar Meyers's claim, and I will deny the defendants' motions to dismiss.

## IV.   CRI's Motion to Dismiss FCU's Third-Party Complaint

Soon after Meyers filed suit against FCU, FCU in turn filed a third-party complaint against CRI. In its third-party complaint, FCU alleges that CRI "provided and managed" the computer program that produced the allegedly offending adverse-action letters, Third-Party Compl. ¶ 8, and it asks for relief in the form of contribution or indemnity, *id.* ¶ 9.

CRI has moved to dismiss on the grounds that it cannot be liable for FCU's FCRA violations under applicable law. As CRI argues, the question whether indemnification or contribution is available is one of federal, not state, law. *See Nw. Airlines, Inc. v. Transp.*

*Workers Union of Am., AFL-CIO*, 451 U.S. 77, 90 (1981).[6]  In addition, CRI is correct

that neither will lie unless authorized by the statute itself or by federal common law.  *Id.*

As to the statute: It is clear that FCRA does not expressly create a cause of action for

indemnity or contribution.  And the Third Circuit has admonished that, as a general

matter, those causes of action are not to be implied where, as here, the statute otherwise

creates a detailed remedial scheme.  *Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d

402, 425 (3d Cir. 2003).  Thus, I conclude that FCRA does not—expressly or

impliedly—authorize an action for indemnity or contribution.  *See, e.g.*, *McSherry v.*

*Capital One FSB*, 236 F.R.D. 516, 522 (W.D. Wash. 2006); *Connor v. Howe*, 344 F.

Supp. 2d 1164, 1171 (S.D. Ind. 2004); *Kay v. First Continental Trading, Inc.*, 966 F.

Supp. 753, 754–55 (N.D. Ill. 1997).

As to federal common law: A claimed cause of action for contribution or

indemnity is not cognizable under federal common law unless such a cause of action

would implicate a "'uniquely federal interest,'" *Tex. Indus., Inc. v. Radcliff Materials,*

*Inc.*, 451 U.S. 630, 642 (1981) (*quoting Banco National de Cuba v. Sabbatino*, 376 U.S.

398, 426 (1964)), or unless Congress can be deemed to have delegated to the courts the

power to "create governing rules of law."  *Id.*  Neither is the case here.  Much as in *Texas*

*Industries*, the only federal interest in contribution or indemnification is the vindication of

_____

[6] Although the *Northwest Airlines* opinion dealt only with contribution, I agree with the various courts of appeals that have held that its reasoning applies with equal force to claims for indemnity.  *See, e.g.*, *Mortgages, Inc. v. U.S. Dist. Ct. for the Dist. of Nev.*, 934 F.2d 209, 212 n.3 (9th Cir. 1991); *Levit v. Ingersoll-Rand Fin. Corp.*, 874 F.2d 1186, 1191–92 (7th Cir. 1989); *Green v. U.S. Dep't of Labor*, 775 F.2d 964, 971 (8th Cir. 1985).

federal statutory rights, but because that interest "does not involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority," it is insufficient to ground a federal common law cause of action. *Id.* Similarly, FCRA contains no delegation to the courts of the power to create additional or supplementary liabilities.

Rather than challenging CRI's statements of law, FCU claims that it will establish liability on a contractual theory. In support it cites *Yohay v. City of Alexandria Employees Credit Union*, 827 F.2d 967 (4th Cir. 1987). That case is puzzling because it applied a state-law indemnity standard to FCRA without addressing the *Northwest Airlines/Texas Industries* holdings at all. *Id.* at 973. Moreover, the standard it applied was not based on any contract between the parties; it was, rather, based on principles of restitution. *See White v. Johns-Manville Corp.*, 662 F.2d 243, 249 (4th Cir. 1981) (describing indemnity as a "restitutionary principle") (*cited in Yohay*, 827 F.2d at 973). Because I cannot square the *Yohay* Court's approach with *Northwest Airlines* and *Texas Industries*, I decline to follow it. *See Kudlicki v. MDNA, Inc.*, No. 05-2589, 2006 WL 1308617, at *3 (N.D Ill. May 10, 2006) (declining to apply state-law indemnity claim to FCRA violation); *McMillan v. Equifax Credit Info. Servs.*, 153 F. Supp. 2d 129, 132 (D. Conn. 2001) (expressing doubt that *Yohay* was decided correctly).

This is not to say that FCU could not pursue a state-law breach of contract action if its contract with CRI contained some sort of warranty or indemnity provision. *Northwest*

*Airlines* and *Texas Industries* appear to bar only off-the-contract actions for indemnity and contribution, as neither case mentions an allegation of contract-based contribution. I have previously ruled that FCRA does not occupy the field of regulating transactions between consumers and prospective creditors, and that only state causes of action inconsistent with it are preempted. *Hughes v. Firedlity Bank*, 706 F. Supp. 639, 640–41 (E.D. Pa. 1989); *accord Davenport v. Farmers Ins. Group*, 378 F.3d 839, 842–43 (8th Cir. 2004). It is certainly arguable that allowing a prospective creditor to shift its liability by contract would not conflict with Congress's purpose, as the prospective creditor's primary liability would still give it a significant interest in complying with the law. *See United States v. QVC, Inc.*, No. 04-1276, 2005 WL 327550, at *1 (E.D. Pa. Feb. 8, 2005) (reaching similar conclusion with regard to the Federal Trade Commission Act). On the other hand, it would seem that indemnification should not be available, even by contract, if the prospective creditor commits a willful violation of FCRA. *See Globus v. Law Research Servs., Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969) (refusing to enforce contractual indemnity clause when underwriter has willfully violated securities laws).

Stating a claim for breach of contract requires, at the least, alleging the existence of a contract, including its essential terms, and how it was breached.[7] *Kane v. State Farm Fire & Cas. Co.*, 841 A.2d 138, 1042 (Pa. Super. Ct. 2003). Here, all FCU has alleged is that CRI "provided and managed" software. Third-Party Compl. ¶ 7. That characterization is insufficient for FCU's action to proceed on a breach-of-contract

---

[7] I am relying on Pennsylvania law, as neither party has suggested that any other state's law would apply to this action.

theory, as it alleges neither existence of a contract, nor the essential terms of that contract, nor how CRI breached it.  Because FCU has not adequately pleaded a breach-of-contract claim, I will dismiss its complaint.

At the end of its response to CRI's motion to dismiss, FCU suggests that it can amend its complaint to allege a viable cause of action.  I note that in our circuit properly requesting leave to amend a complaint requires attaching a draft of the amended version. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007).  Because FCU has not done so, I will not construe its suggestion as a formal request for leave to amend.  Nevertheless, it would seem appropriate to provide FCU the opportunity to bring a breach-of-contract claim if it can do so.  Therefore, I will dismiss its third-party complaint and will, *mea sponte*, grant FCU leave to amend its complaint by Monday, November 5, 2007.

**V.      Motion for Class Certification**

Meyers filed a motion for class certification early in this litigation.  Briefing on that motion has been stayed for many months now, so the motion is not yet ripe for disposition.  It is, however, time to lift the stay and set a new briefing schedule. Therefore, I will give FCU until Monday, November 5, 2007 to file a response, and Meyers until Monday, December 10, 2007 to file a reply.  An appropriate order follows.

-19-

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TANGLER MEYERS,
on behalf of herself and others similarly
situated,

                    Plaintiff,

          v.


FREEDOM CREDIT UNION,
                    Defendant,

          v.


CREDITOR RESOURCES, INC.,
                    Third-Party Defendant.

CIVIL ACTION

No. 05-3526


    **AND NOW**, this    day of September, 2007, for the reasons stated in the accompanying opinion, it is hereby ORDERED:

    (1)    the defendants' motions to dismiss the plaintiff's amended complaint are DENIED;

    (2)    third-party defendant Creditor Resources' motion to dismiss third-party plaintiff Freedom Credit Union's third-party complaint is GRANTED, and that complaint is DISMISSED; third-party plaintiff Freedom Credit Union is GRANTED leave to amend its third-party complaint by November 5, 2007;

    (3)    defendant Freedom Credit Union shall file any response to plaintiff's motion for class certification by November 5, 2007; plaintiff shall file any reply by December 10, 2007.

                              BY THE COURT:

                              /s/ Louis H. Pollak

                              _____

                              Pollak, J.